IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
June 21, 2022 Session

IN RE JOSIE G.

Appeal from the Juvenile Court for Hamilton County
No. 295990          Robert D. Philyaw, Judge

_____

No. E2021-01516-COA-R3-PT
_____

In this case involving termination of the mother's parental rights to her child, the trial court determined that two statutory grounds for termination had been proven by clear and convincing evidence. The trial court further determined that clear and convincing evidence demonstrated that termination of the mother's parental rights was in the child's best interest.[1] The mother has appealed. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and ARNOLD B. GOLDIN, J., joined.

Ardena Garth Hicks, Chattanooga, Tennessee, for the appellant, Rodreka G.

Herbert H. Slatery, III, Attorney General and Reporter, and Jordan K. Crews, Senior Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

I. Factual and Procedural Background

This case focuses on Josie G., the minor child ("the Child") of Rodreka G. ("Mother") and William H. ("Father"). The Child was approximately two weeks of age when the Tennessee Department of Children's Services ("DCS") filed a petition in the

---

[1] The trial court terminated the father's parental rights to the child in the same proceeding. Inasmuch as the father has not appealed the termination of his parental rights, we will confine our analysis to those facts relevant to the mother's appeal.

Hamilton County Juvenile Court ("trial court") on December 2, 2016, alleging that the Child was dependent and neglected because Mother was "homeless, unstable, and ha[d] untreated mental health issues." In the dependency and neglect petition, DCS stated that Mother had reported not knowing the identity of the Child's father. At the time of the initial DCS referral regarding the Child, Mother had been admitted to Erlanger Hospital ("Erlanger") in Chattanooga due to postpartum bleeding, and the Child was with her although not under treatment. According to the petition, upon a referral, a child protective services investigator interviewed Mother at Erlanger, and Mother reported to the investigator that she had stayed with her father (the Child's maternal grandfather) in Nashville and given birth to the Child in Nashville "in an attempt to avoid [DCS] becoming involved with her again."

DCS further averred in the dependency and neglect petition:

The mother has a significant history with [DCS]. Specifically, her rights to three other children have been involuntarily terminated by this Honorable Court. The most recent termination of parental rights occurred on September 8, 2016 regarding her other child, Jareuel [G.-B.]. The mother's rights were terminated due to substantial noncompliance with the permanency plan, persistent conditions, and mental incompetence.

Prior to the current referral, [DCS] was unaware of the mother's whereabouts. She was last known to be homeless. At one point during her pregnancy with the subject child, she was living in a car. In addition, she has not been receiving mental health treatment or taking any medication for her mental health issues.

The trial court entered an *ex parte* protective custody order on December 2, 2016, awarding temporary legal custody of the Child to DCS. At that time, the Child was placed in the care of a foster parent. In May 2017, with the assistance of Omni Visions foster care resources coordinators, the Child was placed in the care of the foster parents with whom she has remained throughout the pendency of the case except for an unsuccessful one-month trial home placement with Father in 2019. In its protective custody order, the trial court granted to Mother supervised visitation with the Child.

The trial court entered an order adjudicating the Child dependent and neglected on May 1, 2017, *nunc pro tunc* to a hearing conducted on April 11, 2017. The court noted in its order that Mother was awaiting adjudication on a criminal charge for allegedly assaulting a charge nurse at Erlanger at the time of the Child's removal into DCS

custody.  Pursuant to Tennessee Code Annotated § 37-1-102(b)(13) (2017),[2] the court adjudicated the Child dependent and neglected upon finding Mother to be "homeless, unstable and [suffering from] untreated mental health issues."  Mother was again granted supervised visitation.

At the time of the dependency and neglect adjudication, Father was still unidentified to DCS or the trial court.  According to the termination petition, the trial court determined Father to be the biological father of the Child following paternity testing ordered on July 5, 2017.

Prior to filing the petition for termination of parental rights, DCS developed five permanency plans for Mother, spanning January 11, 2017, as the date the first was developed, through April 14, 2020, as the date of the fifth plan's development.  Each permanency plan had been ratified by the trial court and was presented by DCS as an exhibit during trial.  Mother's responsibilities set forth in the first plan included undergoing a mental health intake assessment and following all recommendations, undergoing a parenting assessment, obtaining and maintaining safe and stable housing for at least six months, actively participating in parenting classes, refraining from illegal activities or associating with those known to participate in illegal activities, refraining from exhibiting hostility toward service providers or DCS workers, adhering to a visitation schedule, and paying child support as ordered.  Mother's responsibilities in the subsequent permanency plans remained substantially similar.  Upon allegations that Mother's visits with the Child had been inconsistent, requirements for Mother in the fifth and final permanency plan added responsibilities of maintaining regular visitation with the Child and developing a bonded relationship with the Child.

Father, who was residing with a paramour, W.D., was included in the permanency plans beginning in January 2018 with the fourth plan.  In an order entered on March 26, 2019, the trial court found both Father and Mother in substantial compliance with the fourth permanency plan.  Father was then granted unsupervised visitation in May 2019 and a trial home placement for the Child in Father's home in August 2019.  However, upon subsequent investigation into bruising on the Child, discovered while she was in daycare and allegedly inflicted by W.D., DCS removed the Child from Father's care the following month.  Following a review hearing conducted in December 2019, the trial court entered an order on March 3, 2020, determining Mother to be in only partial compliance with the permanency plan upon finding that she had not been consistently taking her prescribed medications.

---

[2] In its adjudicatory order, the trial court stated that the Child was dependent and neglected pursuant to the statutory definition provided at Tennessee Code Annotated § 37-1-102(b)(12).  However, prior to the dependency and neglect petition's filing, the General Assembly had recodified this definition at § 37-1-102(b)(13).  *See* 2016 Tenn. Pub. Acts, Ch. 979, § 4 (S.B. 2121), eff. April 27, 2016.

Throughout the pendency of this case, Mother's mental health concerns were a primary issue in terms of her ability to care for the Child, and she underwent two clinical parenting assessments at DCS's request, one performed by Dr. Bertin Glennon over the course of three days in the fall of 2017 and one performed by Benjamin James Biller, M.S, in September 2020. At trial, DCS presented both assessment reports as evidence, and Mr. Biller testified.

In his report, Dr. Glennon agreed with diagnoses of Mother made during a 2014 clinical assessment, namely: "Bipolar I, Latest episode depressive with psychosis; Major Depression with Psychotic Features; and Schizophrenia by history." He noted that during Mother's 2014 assessment, she had been given an intelligence quotient ("IQ") test and had been evaluated as having a "very serious" intellectual disability. Dr. Glennon did not repeat the IQ test. Dr. Glennon concluded that Mother had "cognitive problems" and that although she suffered from "a mental illness" that "move[d] from depression, to mania and back to depression," she had expressed a desire not to utilize prescribed medications. He opined that custody of the Child should not be awarded to Mother "unless and until she [had] demonstrated at least a year of having a regimen of effective medication and she [had] demonstrated that she [could] follow the regimen exactly."

In his report, Mr. Biller noted that Mother fell asleep during the clinical interview with him several times and had to be awakened to answer some questions while he had to omit the answers to some questions as unresponsive. Mr. Biller characterized this behavior as "odd," particularly considering the purpose of the assessment, given that parents in Mother's situation would generally attempt to positively impress the assessor. In his report, Mr. Biller summarized that Mother had not "demonstrate[d] the mental ability to provide safe parenting for her children" and that her "emotional characteristics [did] point to significant psychopathology that would impede her ability to parent her children." He stated that Mother "appear[ed] to have limited plans for changing these patterns."

DCS filed its petition to terminate the parental rights of both parents to the Child on January 19, 2021. As relevant on appeal, DCS alleged statutory grounds against Mother of persistence of the conditions leading to the Child's removal from Mother's custody, pursuant to Tennessee Code Annotated § 36-1-113(g)(3), and mental incompetence pursuant to Tennessee Code Annotated § 36-1-113(g)(8). DCS further alleged that it was in the Child's best interest for Mother's parental rights to be terminated. The trial court subsequently entered orders respectively appointing an attorney to represent each parent and attorney John Allen Brooks as a guardian *ad litem* ("GAL") to represent the Child.

On February 18, 2021, the GAL filed a motion to terminate visitation with both parents. In support of his motion, the GAL stated that the Child had been meeting with a psychologist for several months and that the "the main cause for this medical need [was] the psychological damage the visitation with the child's actual parents [was] causing." Attaching copies of Mr. Biller's report, a preliminary version of Dr. Glennon's report, and a letter written by a clinical psychologist who had treated the Child, the GAL further averred that visitation was causing the Child "to have highly negative emotional reactions to contact with her natural parents and resulted in regressive behavior following contact with her parents." Following a hearing, the trial court entered an order on February 24, 2021, setting the termination trial and announcing an agreement that the GAL's motion would be set in front of the magistrate.[3]

The trial court conducted a bench trial spanning two days on July 14 and September 16, 2021. Mother appeared before the court on both days of trial. Father failed to appear the second day, and upon DCS's request, the trial proceeded in his absence. DCS initially called both parents as adverse witnesses. As relevant to Mother, DCS also presented testimony during trial from Mr. Biller; Omni Visions foster care resource coordinators, Ruthanne Higgins and Shatera Simmons; DCS investigator Seth Shelton; the Child's foster mother ("Foster Mother"); and Father's paramour, W.D. DCS also presented as an exhibit the deposition testimony of Alexis Nolan, who was the DCS family services worker assigned to the case since June 2020.[4] In addition to the dependency and neglect and permanency plan records, DCS presented as evidence, *inter alia*, the clinical parenting assessment of Mother completed by Mr. Biller in September 2020, a May 2010 trial court order terminating Mother's parental rights to her two eldest children, and a September 2016 trial court order terminating Mother's parental rights to her third child. Mother presented a photograph of the Child sleeping with her head resting on Mother's leg during a supervised visit. The GAL presented the November 2017 clinical parenting assessment of Mother conducted by Dr. Glennon.

In its final order, entered on November 18, 2021, the trial court stated that it had heard proof regarding the Child's "medical and developmental issues." The court particularly noted the testimony of Ms. Higgins with Omni Visions, who testified within her capacity as the social worker for medically fragile children that from 2017 to 2018, the Child had "required near constant oxygen, had acid reflux, and was developmentally delayed." Ms. Higgins also testified that by the time of trial, the Child had "receiv[ed] multiple therapies" and was "doing much better." However, Ms. Higgins reported that

---

[3] Although the disposition of the GAL's motion is not entirely clear from the record, it appears to have been subsumed into the termination proceedings.

[4] The trial court sustained a limited objection from Mother's counsel regarding a small portion of Ms. Nolan's deposition, and the deposition was otherwise accepted as an exhibit without objection.

the Child "required an abnormally high level of care and work" and that "at no time during [Ms. Higgins's] oversight of this case would she have recommended unsupervised visits for [Mother]." The trial court credited Foster Mother's testimony that the Child required "numerous doctor and therapy appointments," a "need for structure," and "a higher level of care than that of most children." The court noted Foster Mother's testimony that the foster parents wished to adopt the Child.

The trial court determined that statutory grounds existed to terminate the parental rights of both parents. Specifically as to Mother, the court found by clear and convincing evidence that the conditions leading to removal of the Child from her custody had persisted and that Mother was mentally incompetent to adequately provide care for the Child. The court further found by clear and convincing evidence that termination of Mother's parental rights was in the Child's best interest. Mother timely appealed.

## II. Issues Presented

Mother presents two issues on appeal, which we have restated slightly as follows:

1.    Whether the trial court erred by finding clear and convincing evidence supporting the statutory grounds of persistence of the conditions leading to the Child's removal from Mother's custody and Mother's mental incompetence to provide adequate care for the Child.

2.    Whether the trial court erred by finding clear and convincing evidence that it was in the Child's best interest to terminate Mother's parental rights.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal

and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has explained:

> The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)]. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).

> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.* 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

\* \* \*

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

### IV. Grounds for Termination of Mother's Parental Rights

Tennessee Code Annotated § 36-1-113 (2021) lists the statutory requirements for termination of parental rights, providing in relevant part:

(a)     The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4. . . .

* * *

(c)     Termination of parental or guardianship rights must be based upon:

(1)     A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2)     That termination of the parent's or guardian's rights is in the best interests of the child.

The trial court determined that the evidence clearly and convincingly supported a finding of two statutory grounds to terminate Mother's parental rights: (1) persistence of the conditions leading to the Child's removal from Mother's custody and (2) Mother's mental incompetence to adequately provide care for the Child. We will address each statutory ground in turn.

A. Persistence of Conditions Leading to the Child's Removal

The trial court found clear and convincing evidence of the statutory ground of persistence of the conditions leading to removal of the Child from Mother's custody. Regarding this statutory ground, Tennessee Code Annotated § 36-1-113(g)(3) (2021) provides:

>   (3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>
>   (i)     The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
>
>   (ii)    There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
>
>   (iii)   The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;
>
>   (B)     The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

In its final judgment, the trial court stated the following specific findings regarding this statutory ground:

>   Pursuant to Tenn. Code Ann. § 36-1-113(g)(3), the Court finds that [DCS] has proven by clear and convincing evidence the statutory elements of persistent conditions, as to [Mother].
>
>   [Mother's] issues have remained constant in the last five (5) years of this custodial episode. [Mother] has been generally unstable and has had mental health issues, which she failed to address with medication. She still

- 9 -

has mental health diagnoses which make it hard for her to parent a child, especially a child with the kind of extensive needs as this one. More recently, Mr. Biller testified of his serious concerns regarding [Mother's] ability to parent the child, which was the reason the child was taken into custody in the first place and those concerns persist today. It does not appear there is a likelihood that these conditions will be remedied any time soon. [Mother] is in no position to care for this child and continuing the parent child relationship greatly diminishes the child's chances of integration into a stable and loving home.

(Paragraph numbering omitted.)

Upon careful review, we determine that a preponderance of the evidence supports the trial court's findings as to this statutory ground. We note that as the trial began, the Child had been in protective custody for far longer than the statutory six-month minimum. Following the filing of a petition alleging dependency and neglect, the Child was removed from Mother's physical and legal custody by the trial court's order entered on December 2, 2016, and placed in the custody of DCS. By the time the termination trial began in July 2021, the Child, who had been two weeks of age when removed from Mother's custody, had been in DCS custody for approximately four and one-half years.

As alleged in the dependency and neglect petition and subsequently found in the trial court's May 2017 adjudicatory order, the reasons for the Child's removal from Mother's custody were that Mother was "homeless, unstable and [suffering from] untreated mental health issues." On appeal, Mother states that she "attempted to complete all the tasks in her [permanency] plans." However, Mother does not deny that her instability and mental health issues persisted at the time of trial. Instead, she focuses her argument on an alleged lack of assistance from DCS in remedying her situation, particularly during "the COVID-19 pandemic season." As DCS points out, to some extent Mother appears to be conflating the statutory ground of substantial noncompliance with the reasonable requirements of a permanency plan, *see* Tenn. Code Ann. § 36-1-113(g)(2), with the statutory ground of persistence of the conditions leading to a child's removal, *see* Tenn. Code Ann. § 36-1-113(g)(3). Mother asserts that because the reasons for the Child's removal from her custody involved mental health issues that she was tasked with addressing in the permanency plans, "an analysis of persistence of conditions . . . necessarily entails the reasonableness of and the mother's compliance with the plan." However, DCS did not allege the ground of substantial noncompliance with a permanency plan against Mother.

Concerning the focus of the statutory ground at issue, persistence of conditions, this Court has recently explained:

The persistence of conditions ground focuses "on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." [*In re Audrey S.*, 182 S.W.3d,] 874 [(Tenn. Ct. App. 2005)]. The goal is to avoid having a child in foster care for a time longer than reasonable for the parent to demonstrate the ability to provide a safe and caring environment for the child. *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010), *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). Thus, the question before the court is "the likelihood that the child can be safely returned to the custody of the [parent], not whether the child can safely remain in foster care." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

*In re Kaisona B.*, No. W2020-01308-COA-R3-PT, 2021 WL 4319624, at *6 (Tenn. Ct. App. Sept. 23, 2021). "Under this [persistence of conditions] ground, a parent's inability to eliminate such conditions does not need to be willful." *In re Braden K.*, No. M2020-00569-COA-R3-PT, 2020 WL 5823344, at *9 (Tenn. Ct. App. Sept. 30, 2020) (citing *In re Dakota C.R.*, 404 S.W.3d 484, 499 (Tenn. Ct. App. 2012)).

During trial, Mother testified that she had been meeting with a therapist through the Mental Health Cooperative in Chattanooga once or twice a month, either virtually or in person, until the therapist recently began maternity leave. She acknowledged that she had voluntarily admitted herself into Parkridge Valley Hospital in Chattanooga in October 2020 for mental health issues and that she had told the staff there that she had not taken any mental health medications since June 2020. Although Mother confirmed that she needed mental health medications, she stated that she was not taking any at the time of trial. Mother further testified that she was waiting for someone who would come into her home with appointments to prescribe her medication. Although Mother's testimony in this regard was somewhat vague, even crediting Mother with the efforts to which she testified, such would not constitute a change in conditions that would make it safe to return the Child to her care.

In analysis of this ground, the focus must be on the results of Mother's efforts rather than "the mere fact" that she made those efforts. *See In re Kaisona B.*, 2021 WL 4319624, at *6. Dr. Glennon's 2017 report, Mr. Biller's 2020 report, and Mr. Biller's trial testimony all indicated that Mother continued to suffer from mental health concerns that rendered her unable to safely assume the responsibility of providing care for the Child and that she had not demonstrated that she would follow through on a treatment regimen.

- 11 -

An additional condition leading to the Child's removal was the instability of Mother's housing situation. Although Mother testified that she had been residing in the same apartment for two years at the time of trial and that her rent was paid, she also acknowledged that her "lease [was] up" and that she had not yet found a new place to live. Mother stated that she was "in the process of moving" but did not know to where. As DCS points out, Mother's housing situation was "uncertain" at the time of trial.

Mother argues that DCS failed to make "accommodations for [Mother] and her mental health issues that would provide for the child['s] safety if she were returned to [Mother's] home" and failed to provide Mother with support "during the COVID-19 pandemic season to make progress on what was required of her." She particularly cites the closing paragraph of Mr. Biller's summary and recommendations in his report, in which he stated:

> Due to the age of the children, <u>if they are returned to the home</u>, initial, intermittent unannounced visits would be beneficial to provide a watch over the children to assure as much safety as possible.[5] This would allow [Mother] to know that [DCS] is maintaining an interest in the children. The monitoring could potentially be viewed as a source of support and assistance by [Mother].

(Emphasis added.) Mr. Biller clearly prefaced his recommendation regarding support in the home on whether a decision would be made to return the Child to Mother's custody.

Immediately preceding this recommendation, however, Mr. Biller summarized his concerns regarding Mother's ability to parent as follows in pertinent part:

> [Mother] is estimated to be functioning in the low range of intelligence as based upon her interaction patterns and results of previous testing. Intelligence scores in both rates of fluid and crystallized intelligence tend to be within 3 to 5 points over the course of a decade. She does report having some level of psychotic symptoms. She does report having some level of depression and anxiety. She does not demonstrate the mental ability to provide safe parenting for her children. Her emotional characteristics do point to significant psychopathology that would impede her ability to parent her children.
>
> The concerns expressed by DCS in regards to [Mother's] potential for responsible parenting are primarily related to mental stability, stability

---

[5] At the time of Mr. Biller's assessment report, Mother retained parental rights solely to the Child.

of housing, and stability of income. After having reviewed the information and questioning [Mother] in regards to these areas <u>she appears to have limited plans for changing these patterns</u>.

(Emphasis added.) In his report, and subsequently in his testimony, Mr. Biller essentially opined that Mother's mental health concerns persisted at the time of her evaluation and that she was not making any significant progress toward improvement.

Likewise, in his psychological evaluation and parental assessment conducted four years prior to trial, Dr. Glennon opined that medication for Mother's mental health diagnoses, "if it works effectively cannot be counted on because of her unwillingness to be reliable with the medications." Dr. Glennon found at that time that "[c]ustody should not be turned over to [Mother] unless and until she has demonstrated at least a year of having a regimen of effective medication and she has demonstrated that she can follow the regimen exactly." Dr. Glennon also noted that Mother "show[ed] cognitive problems," and did not "demonstrate making good choices," stating further that "[t]his may be because of her limited ability to learn and relate what she knows to a situation that will demand action so that she can take care of her child."

According to Mr. Biller's report and testimony, these conditions persisted at the time of trial. The evidence preponderated in favor of the trial court's finding by clear and convincing evidence that "[i]t does not appear there is a likelihood that these conditions will be remedied any time soon" to place Mother in a position to safely care for the Child. *See In re B.S.G.*, No. E2006-02314-COA-R3-PT, 2007 WL 1514958, at *7 (Tenn. Ct. App. May 24, 2007) ("A parent's mental incapacity can provide a sufficient factual predicate for a finding that persistent unremedied conditions exist which prevent the safe return of the child or children to that parent's care.").

Moreover, contrary to Mother's argument, whether DCS made reasonable efforts to assist her in regaining custody of the Child and learning to care for the Child in her home is not a factor to be considered when analyzing this statutory ground. *See In re Steven W.*, No. M2018-00154-COA-R3-PT, 2018 WL 6264107, at *22 (Tenn. Ct. App. Nov. 28, 2018) ("[T]he termination statute regarding persistence of the conditions leading to the Children's removal . . . contains no requirement that DCS expend reasonable efforts to assist a parent in remedying such conditions." (citing Tenn. Code Ann. § 36-1-113(g)(3))). As our Supreme Court has held, "the extent of DCS's efforts to reunify the family is weighed in the court's best-interest analysis, but proof of reasonable efforts is not a precondition to termination of the parental rights of the respondent parent." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). We will therefore confine our consideration of the efforts made by DCS to assist Mother to the best interest analysis.

The evidence also supported a determination that continuation of the parent-child relationship would greatly diminish the Child's chances of integration into a safe, stable, and permanent home. As the trial court found, the evidence demonstrated that the Child had "extensive needs," that those needs had been met by her foster parents for more than four years at the time of trial, and that the foster parents had expressed a desire to adopt the Child. *See, e.g.*, *In re Kaisona B.*, 2021 WL 4319624, at \*7-8 (determining that when the twin children had been "placed in their current foster home directly from the hospital," the mother had been unable to remedy the problems leading to removal for nearly two years, and the foster parents wished to adopt the children, "[c]learly, the continuation of Mother's relationship with the Children greatly diminishe[d] their chances of early integration into a permanent home."). We conclude that the trial court properly terminated Mother's parental rights based on clear and convincing evidence of this statutory ground.

### B. Mental Incompetence to Adequately Care for the Child

Mother also contends that the trial court erred by terminating her parental rights on the statutory ground of mental incompetence to adequately provide care for the Child. Tennessee Code Annotated § 36-1-113(g)(8) (2021) provides regarding this ground for termination:

> (8)(A) The chancery and circuit courts shall have jurisdiction in an adoption proceeding, and the chancery, circuit, and juvenile courts shall have jurisdiction in a separate, independent proceeding conducted prior to an adoption proceeding to determine if the parent or guardian is mentally incompetent to provide for the further care and supervision of the child, and to terminate that parent's or guardian's rights to the child;
>
> (B) The court may terminate the parental or guardianship rights of that person if it determines on the basis of clear and convincing evidence that:
>
> > (i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future; and

>    (ii)    That termination of parental or guardian rights is in the best interest of the child;

>    (C)    In the circumstances described under subdivisions (8)(A) and (B), no willfulness in the failure of the parent or guardian to establish the parent's or guardian's ability to care for the child need be shown to establish that the parental or guardianship rights should be terminated[.]

The General Assembly's exclusion of willfulness from this statutory ground "serves to protect children from harm caused by a parent who is incapable of safely caring for them." *See In re D.A.P.*, No. E2007-02567-COA-R3-PT, 2008 WL 2687569, at *5 (Tenn. Ct. App. July 9, 2008). If willfulness were required in order to terminate parental rights for mental incompetence, "an obvious result . . . is to condemn a child, whose parents are unfit to properly care for the child because of mental illness, to a life in serial foster homes without any possibility of a stable, permanent home." *See State, Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990).

This Court has rejected the argument that the ground of mental incompetence is reserved only for parents who have "a condition for which 'no amount of intervention can assist.'" *See In re S.M.R.*, No. M2008-01221-COA-R3-PT, 2008 WL 4949236, at *6 (Tenn. Ct. App. Nov. 18, 2008). This Court has instead affirmed the termination of parental rights when parents have suffered from unalleviated mental disorders such as bipolar disorder, adjustment disorder with anxiety and depressed mood, dependent personality disorder, and schizophrenia disorder. *See e.g.*, *Smith*, 785 S.W.2d at 337-39 (affirming the termination of parental rights of a parent diagnosed with schizophrenic disorder on the basis of mental incompetence although the acts of the mentally disabled parent were not willful); *In re S.M.R.*, 2008 WL 4949236, at *6 (affirming termination of parental rights on the statutory ground of mental incompetence when the parent was diagnosed with bipolar disorder and personality disorder, not otherwise specified); *Dep't of Children's Servs. v. M.R.N.*, No. M2006-01705-COA-R3-PT, 2007 WL 120038, at *10 (Tenn. Ct. App. Jan. 17, 2007) (affirming termination of parental rights on the statutory ground of mental incompetence based on a diagnosis of adjustment disorder with anxiety and depressed mood as well as dependent personality disorder). The parent's mental condition, however, must impair the parent to an extent that he or she cannot adequately provide for the care and supervision of the child. *See* Tenn. Code Ann. § 36-1-113(g)(8)(B)(i).

In its final judgment, the trial court stated the following specific findings of fact regarding this statutory ground:

Pursuant to Tenn. Code Ann. []§ 36-1-113(g)(8)(B), the Court finds that [DCS] has proven by clear and convincing evidence the statutory elements of Mental Incompetence as to [Mother].

Testimony was provided by forensic psychological examiner, Benjamin Biller, as well as the prior report from Dr. Glennon, which was entered as an exhibit without objection.

Considering all the evidence, the Court finds that [Mother] is incompetent to adequately care for the subject child because of her mental health issues, which are not likely to be remedied any time in the near future. These diagnoses have been in place for a number of years and still persist today. [Mother] was found to be incompetent in 2016, and that order was entered as an exhibit, as [were] Dr. Glennon's findings from 2017. Mr. Biller testified of his assessment and [Mother's] inability to understand the importance of the assessment and the fact she fell asleep during the meeting. This child cannot safely be placed with [Mother].

(Paragraph numbering omitted.) We agree with the trial court.

In support of the finding that Mother's mental health diagnoses had "been in place for a number of years," the trial court cited its own August 25, 2016 order, presented as a trial exhibit during the instant action, terminating Mother's parental rights to her third child on the basis of Mother's mental incompetence to adequately provide care for the child as well as on the statutory grounds of persistence of the conditions leading to the child's removal and Mother's substantial noncompliance with the reasonable requirements of a permanency plan.[6] DCS also presented as an exhibit the trial court's April 30, 2010 order terminating Mother's parental rights to her two eldest children based on the same three statutory grounds as in the 2016 order. In both of these prior termination orders, the trial court cited the conclusions and testimony of Dr. Alice Greaves, who had conducted separate parenting assessments of Mother, one prior to the 2010 trial, and the second in December 2014.

In the 2010 order, the trial court found as to this ground:

[Mother's] mental condition is such that it prevents her from providing safe and stable care and supervision for the Children. Specifically, in the opinion of Dr. Greaves, [Mother] suffers from such

---

[6] At the time of the 2016 termination trial, Mother was pregnant with the Child who is the focus of this case.

extreme mental illness that it is not possible for her to properly care for herself, much less the Children.

In the 2016 order, the court, crediting Dr. Greaves's testimony, found:

> There is little chance that [Mother's] condition can be improved to such an extent that the child can be placed safely with her in the foreseeable future because of [Mother's] resistance to help, to advice, to treatment, to counseling, and to medication.

Although these prior orders are not proof of Mother's condition at the time of the instant trial, we determine that the trial court properly considered them as evidence demonstrating the number of years that Mother had been suffering from mental illness without making significant progress toward becoming capable of providing adequate care for a child. *See State v. CBH*, No. E2003-03000-COA-R3-PT, 2004 WL 1698209, at *2 (Tenn. Ct. App. July 29, 2004) (noting in a termination proceeding involving statutory grounds of, *inter alia*, mental incompetence and persistence of conditions that "the history of past behavior is relevant to the issue of future behavior.").

During the pendency of the instant action, Dr. Glennon completed his assessment in the fall of 2017. In his report, presented as an exhibit during trial, Dr. Glennon noted that he had reviewed Dr. Greaves's assessments of Mother and had chosen to use different instruments whenever possible to either "cast doubts" or "support" the previous diagnoses, stating that "[i]f similar findings [came] from these new instruments, the previous instruments and their conclusions would be supported." Dr. Glennon ultimately came to the same conclusions as Dr. Greaves. He did not repeat the IQ test performed by Dr. Greaves, noting that "[s]ince intellectual disability has a very small chance of changing, significantly," Mother's "diagnosis would still be Significant Intellectual disability" as found by Dr. Greaves. Upon the results of his administered instruments, Dr. Glennon agreed with Dr. Greaves's diagnoses of Mother as suffering from "Bipolar I, Latest episode depressive with psychosis; Major Depression with Psychotic features; and Schizophrenia by history." Dr. Glennon summarized in his report in pertinent part:

> [Mother] has a mental illness. This mental illness moves from depression, to mania and back to depression. In the times between mania and depression she is likely feeling driven to find excitement to get out of her depression. At times when she is in a better mood, she usually becomes bored. From there the cycle starts all over. There are indications in the record that she has been prescribed medication, but she reports that she does not like these medications and tries not to use them. It seems to this

- 17 -

clinician that the medication, if it works effectively cannot be counted on because of her unwillingness to be reliable with the medications.

Custody should not be turned over to [Mother] unless and until she has demonstrated at least a year of having a regimen of effective medication and she has demonstrated that she can follow the regimen exactly.

[Mother] shows cognitive problems, while she seems to be aware of what is happening to and around her, she does not demonstrate making good choices. This may be because of her limited ability to learn and relate what she knows to a situation that will demand action so that she can take care of her child. The problem is that she will have to care for a one year old child.

[Mother] has a history of diagnoses that are major mental illnesses. Progress can only be made slowly and carefully. If [Mother] does begin to make progress, supervisors must be careful not to expect that change will be rapid.

At trial, Mr. Biller was accepted by the trial court as an expert in clinical psychology. He testified that in completing his psychological evaluation and parenting assessment of Mother in September 2020, he had reviewed Mother's previous evaluations, which had been sent to him by DCS, in addition to observing Mother's responses and behavior during her assessment in his office. He explained that although Mother completed some testing in his office, she repeatedly fell asleep to the point that she was snoring and unresponsive to questions. He stated that he would be concerned about Mother's ability to parent a young child in part based on "observed behavior of not taking the issue of parenting seriously just because she fell asleep during the interview." Mr. Biller noted that in twenty years of assessing parents, Mother was the first parent he had observed falling asleep during an assessment. Mr. Biller further explained: "[I]f she's not taking that seriously in this environment where she was told that this is, you know, going to be utilized to establish custody, I would assume that that would transfer poorly to a home environment as well."

Mr. Biller reported that although Mother stated that she was taking no medications, she appeared "seemingly sedated." In response to a question posed by the GAL concerning the effect on a schizophrenic individual of not taking prescribed medication, Mr. Biller stated that the absence of psychotropic medication would "lead to an increase in symptoms." When questioned by Mother's counsel regarding whether a lack of Mother's prescribed medication would be likely to make her sleepy, Mr. Biller

opined that it would not. As noted in a previous section of this Opinion, Mr. Biller concluded in his report and reiterated in his testimony that Mother's "emotional characteristics do point to significant psychopathology that would impede her ability to parent her children."

Mother presented no countervailing expert proof regarding her mental status. Apart from reference to the statute, Mother's argument on appeal regarding this statutory ground consists of two sentences. She asserts that because "[t]he record lacks any evidence that [DCS] made accommodations for the mother regarding her mental health issues," "the evidence preponderates against a clear and convincing finding that the mother was not able to deal with her mental health treatment." Mother cites to no authority in support of this assertion. In response, DCS notes efforts made, including DCS's provision of in-home parenting education services through Omni Visions and referrals for mental health assessment and treatment.

However, DCS also correctly points out that the elements of this statutory ground do not require a finding that DCS made reasonable efforts to assist Mother in making progress in her mental health status such that she could adequately provide care for the Child. *See In re David J.B.*, No. M2010-00236-COA-R3-PT, 2010 WL 2889265, at *7 (Tenn. Ct. App. July 23, 2010) ("[T]he burden is on DCS to demonstrate two essential facts: (1) that Mother is *presently unable* to care for the subject children and (2) that Mother is *unlikely to be able to care for the children in the near future*." (citing Tenn. Code Ann. § 36-1-113(g)(8))). We emphasize that "the extent of DCS's efforts to reunify the family is weighed in the court's best-interest analysis, but proof of reasonable efforts is not a precondition to termination of the parental rights of the respondent parent." *In re Kaliyah S.*, 455 S.W.3d at 555.

Following a thorough review of the record, we conclude that the evidence does not preponderate against the trial court's finding by clear and convincing evidence that Mother was mentally incompetent to adequately provide for the care and supervision of the Child. Mother's mental condition is presently and is likely to remain so impaired that it is unlikely that Mother would be able to assume care of and responsibility for the Child in the near future. Therefore, we affirm the termination of Mother's parental rights based on the statutory ground of mental incompetence.

## V. Best Interest of the Child

When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005); *see also In re Carrington H.*, 483 S.W.3d at 523

("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." (quoting *In re Angela E.*, 303 S.W.3d 240, 254 (Tenn. 2010))). Tennessee Code Annotated § 36-1-113(i) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

The version of Tennessee Code Annotated § 36-1-113(i) (Supp. 2020) in effect when the petition was filed in the instant action listed the following factors for consideration:[7]

(1)  Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)  Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)  Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)  Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)  The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

---

[7] Effective April 22, 2021, the General Assembly has amended Tennessee Code Annotated § 36-1-113(i) by deleting the previous subsection in its entirety and substituting a new subsection providing, *inter alia*, twenty factors to be considered in determining a child's best interest in a case involving termination of parental rights. *See* 2021 Tenn. Pub. Acts, Ch. 190 § 1 (S.B. 205). However, because the termination petition in this case was filed prior to the effective date of the amendment, the statutory best interest factors provided in the prior version of the statute are applicable here. *See, e.g.*, *In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017).

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

As our Supreme Court has explained regarding the best interest analysis:

"The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." In re Angela E., 303 S.W.3d [240,] 254 [(Tenn. 2010)].

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d at 555 (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must

- 21 -

remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

In the instant action, the trial court concluded that the statutory factors weighed against maintaining Mother's parental rights to the Child, finding as follows in pertinent part:

The Court finds, pursuant to Tenn. Code Ann. § 36-1-113(i), that it is in the best interest of the child for termination to be granted as to [Mother], as she has failed to address the issues which would make it safe for the child to return to the home despite help from Omni Visions and [DCS]. [Mother] did not exercise regular visitation with the child and there is no meaningful relationship between her and the child.

* * *

Further, termination is in the child's best interest pursuant to Tenn. Code Ann. § 36-1-113(i), because a change in caregivers would have a seriously detrimental effect on the child. She has been with the [foster parents] for over four (4) years. This family is meeting all of her medical, therapeutic, and emotional needs. They are committed to the child and want to adopt. There was plenty of proof that the child wants stability and wants to be with the [foster parents].

(Paragraph numbering omitted.) Upon careful review, we agree with the trial court's determination that termination of Mother's parental rights was in the Child's best interest.

The trial court's findings within its best interest analysis indicate that it expressly weighed factors one through five against maintaining Mother's parental rights to the Child. While conflating the best interest factors somewhat, Mother contends overall that the trial court erred in its analysis because (1) no evidence indicated that Mother "ever caused any physical harm" to the Child, (2) Mother "did have some relationship" with the Child, (3) no evidence indicated that DCS "made accommodations for [the] COVID-19 pandemic and its impact" on Mother, and (4) the pandemic had "an impact on the ability of [Mother] to make progress on her responsibilities."

In relation to factors one, two, and six, Mother asserts that DCS presented no proof that she had ever caused any physical harm to the Child. This lack of evidence regarding abuse is relevant to factor six, which we will address more fully below. However, as DCS points out, under the facts of this case, a lack of physical abuse of the Child on Mother's part has almost no relevance to factors one and two. We have determined in a previous section of this Opinion that the conditions leading to the removal of the Child from Mother's custody persisted at the time of trial and did not show promise of remedy in the near future. Mother did not make sufficient progress in her mental health treatment to effect a lasting adjustment that would make it safe and in the Child's best interest to be in Mother's home. Therefore, the evidence does not preponderate against the trial court's finding regarding factor one.

Considering our determination as to factor one, factor two could only weigh in Mother's favor if DCS had failed to make reasonable efforts to assist her in making a lasting adjustment. *See In re Kaliyah S.*, 455 S.W.3d at 555. Although Mother does not raise this argument *per se* in relation to best interest, she does assert, as she has throughout this appeal in her arguments regarding the statutory grounds, that DCS failed to make accommodations for Mother during the COVID-19 pandemic. In its final order,

the trial court found that Mother had "failed to address the issues which would make it safe for the child to return to the home despite help from Omni Visions and [DCS]" (emphasis added).

During the pendency of the case, DCS developed five permanency plans with Mother. The trial court expressly found in permanency hearing orders, entered respectively in January 2018 and May 2020, that DCS had made reasonable efforts to assist the parents by providing referrals for mental health assessment, counseling, and case management; clinical parenting assessment; and housing, as well as by providing basic and specialized parenting instruction and some assistance with transportation. At trial, Mother acknowledged that she had received in-home parenting instruction in 2017. She had also undergone mental health and parenting assessments with Dr. Glennon and Mr. Biller and had participated in intermittent mental health treatment with the Mental Health Cooperative.

Through Omni Visions, Mother was provided with supervision for visits with the Child throughout the pendency of the Child's time in protective custody. Mother's in-person visits were initially supervised by Ms. Higgins from June 2017 through December 2018 and then by Ms. Simmons in 2019 and the early months of 2020. At the outset of the pandemic in the spring of 2020, Mother was provided with opportunities for virtual visits with the Child, which were supervised initially by Foster Mother and then by Ms. Nolan. According to Ms. Nolan's testimony, Mother missed a scheduled in-person visit in October 2020 when Mother was at Parkridge Valley Hospital, and due to the pandemic, visits were virtual again until May 2021. We determine that the evidence preponderated in favor of the trial court's finding that DCS and Omni Visions provided assistance to Mother, and we further determine that this assistance constituted reasonable efforts to assist Mother in reunifying with the Child. However, given that Mother did not make sufficient adjustments to render it safe to return the Child to her custody, factor two weighs against maintaining Mother's parental rights.

Concerning factors three (Mother's visitation with the Child) and four (whether a meaningful bond had been established), the trial court found that Mother had failed to "exercise regular visitation" and that "no meaningful relationship" existed between her and the Child. On appeal, Mother does not address the trial court's finding regarding the inconsistency of her visits with the Child except to assert that DCS did not provide accommodations for the pandemic's "impact on [Mother] as a parent." As noted above, the record indicates that DCS, through its relationship with Omni Visions, did provide virtual visits during the height of the pandemic and resumed scheduling in-person visits prior to trial.

However, the record also indicates that Mother's attendance at visits was inconsistent. Ms. Nolan testified and Mother acknowledged that Mother had missed twelve visits with the Child between October 2020 and the beginning of trial in July 2021. According to Ms. Nolan, Mother participated in only five visits during that timeframe. As to visitation in the earlier years of the Child's time in protective custody, Ms. Higgins testified that between June 2017 and December 2018, Mother was inconsistent in attending visits and that when she did attend, "[s]he was rarely on time and did not stay the full amount of time that she was allotted." Ms. Simmons, who supervised visitation in 2019 and early 2020, testified that Mother was inconsistent in her attendance at visits during that timeframe as well.

In support of her assertion that Mother had "some relationship" with the Child, Mother relies in part on a photographic exhibit portraying the Child asleep with her head resting on Mother's leg during a visit. In the trial court's findings of fact in its final order, the court particularly referenced this photograph, stating:

> The most compelling evidence that there is any kind of relationship between [Mother] and this child is seen in Exhibit #8, which shows [the Child] asleep on [Mother's] leg during a supervised visit. In this photograph, the child appears to be either completely comfortable or completely worn out. Otherwise, the testimony was that the child screamed and cried during her visits with [Mother] and gave no evidence of a meaningful relationship with [Mother]. While the first three (3) weeks of the child's life are not chronicled, there was testimony that since December 2016, [Mother] has not changed a diaper or even given the child a bottle. The Court finds that there is no meaningful relationship.

As the trial court noted, testimony throughout the trial indicated that visits between Mother and the Child were consistently problematic. Ms. Higgins testified that in the beginning, Mother's visits were scheduled for two hours twice a month. She described those visits as follows:

> It was not a good interaction. [The Child] would get very upset when I would give her to her mother. When she would cry, the mom would usually just hand her back to me. There was not any kind of appropriate care. At one point, she tried to give [the Child] Cheetos. So it was not – there was not good interaction whatsoever.

Ms. Higgins explained that at the time that Mother attempted to feed the Child Cheetos, the Child was eating only specially prepared bottles of liquid with thickener added because of her difficulty swallowing.

According to Ms. Higgins, when the Child was turning a year old, Mother visited and insisted that the Child could walk if she would stop being lazy. Mother let go of the Child's hands while the Child was standing, and the Child "went down to the ground," which was carpeted. Ms. Higgins stated: "[The Child], of course, was very upset, and so I picked her up at that point and comforted her, and I ended the visit." Ms. Higgins also stated that she attempted "to explain to [Mother], both before that incident and right after, that that's just not where [the Child] was developmentally." Ms. Higgins testified that Mother became "very angry" with Ms. Higgins at that point and told her that the Child "was lazy" and should be walking. Ms. Higgins reported that she did not remember seeing Mother feed the Child or change a diaper during the visits she supervised.

Ms. Simmons opined that Mother did not understand the medical and developmental needs of the Child. She described the visits during 2019 and early 2020 as follows:

> When I was initially assigned to the case, [the Child] would – I mean, she basically would just fall out and cry. There wasn't really a connection or a bond. Over time, though, when [the Child] got older, when she started turning three and getting a little bit more sociable, I think she kind of somewhat understood. So it got a little better. There wasn't a bond, but there was something that – you know, they were together, and it wasn't screaming. It was able to be done.

Regarding the Child's separate visits with Mother and Father during the last year prior to trial, Ms. Nolan stated:

> Every time [the Child] comes into the office, she's always clinging onto the foster mom. The foster mom actually has to stay in the DCS office while they did their visitation. The first in-person visitation that I supervised was in October [2020]. That was with [Father]. When [the Child] came into the office, she screamed. She hollered loud. Her face was pouring down in tears. She did not want to do a visit with [Father].

> When she conducted her visit with her mom face to face, she did the same thing. . . .

> * * *

> [Father], he did try to engage sometimes, but [the Child] still cries. She still screams. [Mother], minimum engagement. The last visitation, [the

Child] was sitting on the floor playing with the toy truck by herself. [Mother] was at the table looking at her iPad.

Ms. Nolan further testified that during Mother's last visit with the Child on May 12, 2021, while the Child was present, Mother began to ask Ms. Nolan personal questions and to "make threats" toward Ms. Nolan and her own child. According to Ms. Nolan, Mother was then asked to leave the DCS office, and she did not reappear for a visit with the Child that was scheduled for five days later.

Other than the photographic exhibit of the Child sleeping, Mother has presented no countervailing evidence regarding her relationship with the Child. We conclude that the evidence preponderates in favor of the trial court's determination that Mother had failed to establish a meaningful relationship with the Child.

On appeal, Mother acknowledges that factor five, the effect a change of caretakers and physical environment would likely have on the Child, weighs against maintaining her parental rights. She posits that "counseling for the child could help mitigate the negatives." The trial court found that such a change would have a "seriously detrimental effect" on the Child given that she had resided with the foster parents for more than four years; the foster parents had met her "medical, therapeutic, and emotional needs"; and the foster parents were "committed to" and wished to adopt the Child. Considering the Child's perspective, we are not persuaded by Mother's postulate. We emphasize that "[w]hen considering the statutory factors, 'courts must remember that the child's best interests are viewed from the child's, rather than the parent's, perspective.'" *In re Johnathan M.*, 591 S.W.3d 546, 560 (Tenn. Ct. App. 2019) (quoting *In re Gabriella D.*, 531 S.W.3d at 681).

As to Mother, the trial court did not directly address factor six (whether Mother or anyone residing with her had shown abuse or neglect toward the Child) or factor seven (whether the physical environment of Mother's home was healthy, safe, and free from criminal activity or controlled substances). Mother correctly asserts that DCS presented no evidence of her causing physical harm to the Child, and we note that the only proof presented of abuse involved an incident that occurred during the Child's trial home placement with Father and W.D. Concerning Mother's home, DCS also presented no evidence that Mother's apartment was unsafe. However, Mother did testify that her lease was nearly expired and that she would be relocating. She offered no further information regarding her future home.

Mother asserts regarding factor seven that the trial court "noted that COVID-19 did have an impact on the ability of the mother to make progress on her responsibilities." However, Mother's citation to the record for this assertion is to a juvenile court

magistrate's March 29, 2021 "Findings and Recommendations," in which the magistrate stated that the court noted Mother's counsel's "suggestion" that the pandemic had affected Mother's progress on the permanency plan goals, rather than to any finding by the court. Moreover, considering Mother's undisputed testimony that she had resided in an apartment for the two years prior to trial, it is unclear how Mother's argument regarding the pandemic would be relevant to factor seven.

This Court has previously held, in pertinent part, that "[i]n the absence of evidence that tied" the parent to "abuse" or "an unsafe home," "we must conclude that these factors weigh against termination." *In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *20 (Tenn. Ct. App. July 22, 2020); *see also In re London B.*, No. M2019-00714-COA-R3-PT, 2020 WL1867364, at *11-12 (Tenn. Ct. App. Apr. 14, 2020). We therefore determine that factor six weighs in favor of maintaining Mother's parental rights to the Child and that factor seven, given the uncertainty of Mother's future housing situation, weighs neither for nor against termination.

However, we further determine that factor eight, Mother's mental status, is clearly implicated by the trial court's findings as to the statutory ground of Mother's mental incompetence to adequately care for the Child, as well as to the ground of persistence of conditions. The trial court essentially found that Mother's mental status would prevent her from effectively providing safe and stable care and supervision for the Child. Mother states in her appellate brief that "[t]he record lacks any evidence to weigh for or against factor (8)." DCS argues to the contrary, noting the court's findings regarding Mother's mental health. Inasmuch as both of the proven statutory grounds in this action involve Mother's mental status, we determine that factor eight weighs against maintaining Mother's parental rights to the Child.

Finally, as to factor nine, it is undisputed that Mother did not pay child support. Although the trial court found that Father had failed to pay court-ordered child support, the court made no such findings regarding Mother, and it is not clear that Mother was ever ordered to pay child support. We note that it is well settled in Tennessee that every parent is presumed to have knowledge of a parent's duty to support his or her minor children regardless of whether a court order to that effect is in place. *See* Tenn. Code Ann. § 36-1-102(1)(H) (2021) ("Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children[.]"). Mother testified that she received $774 monthly in Supplemental Security Income ("SSI") disability benefits and that at the time of trial, she had been in a training program for employment at Goodwill for two weeks. When questioned regarding where she had previously been employed, Mother stated, "Well, I have a business license so I can work out of my home," adding that she can "do hair, sell food." As to any home business, Mother acknowledged, however, that "it's not open right now."

When asked whether she had paid any child support, Mother responded: "No. They took away child support. I was, and they took me off of child support." Mother also testified that she had bought "clothes, shoes, food" for the Child.

Although SSI benefits are not subject to legal process for payment of court-ordered child support in Tennessee, *see Tenn. Dep't of Human Servs., ex rel. Young v. Young*, 802 S.W.2d 594, 599 (Tenn. 1990), this Court has considered a parent's disability benefits in the context of parental rights termination to find that a parent could have provided some amount of support for a child, *see, e.g.*, *In re Kierani C.*, No. W2020-00850-COA-R3-PT, No. 2021 WL 4057222, at *12 (Tenn. Ct. App. Sept. 3, 2021); *In re Miracle M.*, No. W2017-00068-COA-R3-PT, 2017 WL 3836020, at *6 (Tenn. Ct. App. Aug. 30, 2017). However, without any further evidence presented in this case regarding Mother's ability to pay child support, we determine that factor nine weighs neither for nor against termination of Mother's parental rights to the Child.

In sum, we determine that factor six is the sole best interest factor weighing in favor of maintaining Mother's parental rights to the Child. However, any failure of the trial court to take note of this factor, an absence of proof of abuse by Mother, constituted harmless error. Based on our thorough review of the evidence in light of the statutory factors, we conclude that the evidence presented does not preponderate against the trial court's determination by clear and convincing evidence that termination of Mother's parental rights was in the best interest of the Child. Having also determined that statutory grounds for termination were established, we affirm the trial court's termination of Mother's parental rights to the Child.

## VI. Conclusion

For the foregoing reasons, we affirm the trial court's judgment. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating Mother's parental rights to the Child and collection of costs assessed below. Costs on appeal are assessed to the appellant, Rodreka G.

s/ Thomas R. Frierson, II
THOMAS R. FRIERSON, II, JUDGE

- 29 -